Citation Nr: 1550144 
Decision Date: 11/30/15 Archive Date: 12/04/15

DOCKET NO. 07-24 353A ) DATE
 )
 )

On appeal from the
Department of Veterans Affairs Regional Office in St. Petersburg, Florida


THE ISSUES

1. Entitlement to service connection for hypothyroidism, including as secondary to psoriatic arthritis.

2. Entitlement to service connection for a sleep disorder, diagnosed as obstructive sleep apnea.

3. Entitlement to service connection for a bilateral lower extremity disorder as secondary to a low back disability.

4. Entitlement to service connection for erectile dysfunction as secondary to a low back disability.

5. Entitlement to an increased rating for chronic low back strain, currently rated as 50 percent disabling.

6. Entitlement to an increased rating for a right eye disability, currently rated as noncompensable.

7. Entitlement to an initial rating in excess of 40 percent for psoriatic arthritis.


REPRESENTATION

Veteran represented by: Disabled American Veterans


ATTORNEY FOR THE BOARD

Tracie N. Wesner, Associate Counsel


INTRODUCTION

The Veteran served on active duty from December 1977 to December 1981 and from December 1984 to December 1988.

This matter comes before the Board of Veterans' Appeals (Board) on appeal from March 2006, November 2006, February 2007, January 2008 and August 2010 rating decisions from the Department of Veterans Affairs (VA) Regional Office (RO) in St. Petersburg, Florida. In July 2012, the issues of service connection for hypothyroidism and a sleep disorder, an increased rating for a right eye disability and a higher initial rating for psoriatic arthritis were remanded by the Board for further development.

The Board has reviewed all pertinent evidence in the Veteran's claims file, which has been converted in its entirety to an electronic record as part of VA's paperless Veterans Benefits Management System (VBMS).

The issue of an increased rating for psoriasis has been raised by the record based on the findings of a September 27, 2013 VA examination (see 38 C.F.R. § 3.157(b)(1)), but has not been adjudicated by the Agency of Original Jurisdiction (AOJ). Therefore, the Board does not have jurisdiction over it, and it is referred to the AOJ for appropriate action. 38 C.F.R. § 19.9(b) (2015).

The issue of entitlement to an initial rating in excess of 40 percent for psoriatic arthritis is addressed in the REMAND portion of the decision below and is REMANDED to the Agency of Original Jurisdiction (AOJ).


FINDINGS OF FACT

1. The Veteran's hypothyroidism did not have its onset in service or manifest to a compensable degree within one year of his active duty service, and is not proximately due to, the result of or aggravated by his service-connected psoriatic arthritis.

2. The Veteran's sleep disorder did not have its onset in service and is not etiologically related to an injury or disease incurred in service. 

3. The Veteran's bilateral lower extremity disorders and erectile dysfunction are not etiologically related to an injury or disease incurred in service, nor are they related to his service-connected chronic low back strain.

4. At no point during the appeal period has the Veteran's chronic low back strain been productive of unfavorable ankylosis of the entire spine or intervertebral disc syndrome with incapacitating episodes having a total duration of at least 6 weeks or more during a 12 month period. 

5. The Veteran's right eye corneal scar disability has been productive of no more than intermittent pain, photophobia, glaring and blurring throughout the appeal period.

CONCLUSIONS OF LAW

1. The criteria to establish service connection for hypothyroidism have not been met. 38 U.S.C.A. §§ 1131, 1112, 1154(a), 5107 (West 2014); 38 C.F.R §§ 3.102, 3.303, 3.307, 3.309, 3.310 (2015).

2. The criteria to establish service connection for a sleep disorder have not been met. 38 U.S.C.A. §§ 1131, 5107 (West 2014); 38 C.F.R §§ 3.102, 3.303 (2015).

3. The criteria to establish service connection for a bilateral lower extremity condition have not been met. 38 U.S.C.A. §§ 1131, 5107 (West 2014); 38 C.F.R §§ 3.102, 3.303, 3.310 (2015).

4. The criteria to establish service connection for erectile dysfunction have not been met. 38 U.S.C.A. §§ 1131, 5107 (West 2014); 38 C.F.R §§ 3.102, 3.303, 3.310 (2015).

5. The criteria for a rating in excess of 50 percent for chronic low back strain have not been met. 38 U.S.C.A. §§ 1155, 5107 (West 2014); 38 C.F.R. §§ 3.102, 4.1, 4.7, 4.10, 4.40, 4.45, 4.59, 4.71a, Diagnostic Codes 5235-5243 (2015).

6. The criteria for a 10 percent rating for a right eye corneal scar disability have been met throughout the appeal period. 38 U.S.C.A. §§ 1155, 5107 (West 2014); 38 C.F.R. §§ 4.79, 4.84a Diagnostic Code 6099-6001 (2008 & 2015).


REASONS AND BASES FOR FINDINGS AND CONCLUSIONS

I. VA's Duties to Notify and Assist

VA has a duty to provide notification to the Veteran with respect to establishing entitlement to benefits, and a duty to assist with development of evidence under 38 U.S.C.A. §§ 5103, 5103A (West 2014); 38 C.F.R. § 3.159(b) (2015).

The duty to notify with regard to the Veteran's claims was satisfied by way of letters sent to the Veteran in November 2005, November 2006, August 2007, May 2008 and May 2010 that, collectively, informed him of his duty and the VA's duty for obtaining evidence, advised of the evidence and information required to substantiate his claims and explained how the VA determines disability ratings and assigns effective dates. 38 U.S.C.A. § 5103(a); Dingess v. Nicholson, 19 Vet. App. 473 (2006); Vazquez-Flores v. Shinseki, 24 Vet. App. 94 (2010).

With respect to the duty to assist, the Veteran's in-service and post-service VA and private treatment records have been associated with the claims file, and he has not identified any additional, outstanding records that have not been requested or obtained. In addition to obtaining pertinent records, VA assisted the Veteran by affording him VA examinations and obtaining medical opinions in support of his claims in January 2007, December 2007, June 2010, March 2011, January 2012, August 2013, September 2013 and July 2014. The Board finds that these reports, taken together, are adequate with regard to the Veteran's claims concerning his hypothyroidism, sleep apnea, erectile dysfunction, bilateral lower extremity, low back and right eye disorders because they included: a physical examination of and interview with the Veteran, a review of the relevant records and history, and appropriate testing. Additionally, the opinions offered contain clear conclusions with supporting data and a reasoned medical explanation connecting the two. See Stefl v. Nicholson, 21 Vet. App. 120, 124-25 (2007); Nieves-Rodriguez v. Peake, 22 Vet. App. 295, 304 (2008). Thus, the VA met its duty to provide a medical examination or opinion pursuant to 38 C.F.R. § 3.159(c)(4)(i) in connection with the claims listed above. 

As noted above, this matter was remanded by the Board in July 2012. In accordance with the remand directives, attempts were made to obtain additional information and private medical records, as well as a copy of the June 2007 medical article cited by the Veteran's treating physician in his February 2008 opinion. See January 2013 and November 2013 Letters to Veteran; see also November 2013 & April 2014 Letters to Dr. H.D. Brannon. In response to these attempts, the Veteran reported that all relevant medical records had been provided. See February 2013, December 2013 and August 2014 Letters from Veteran. The Veteran's treating physician provided a letter stating that the Veteran had been diagnosed with rheumatoid arthritis, but stated that he was not authorized to provide any additional medical records. See December 2013 & May 2014 Letters from Dr. H.D. Brannon. With regard to the June 2007 article identified by Dr. Brannon, attempts to obtain that document yielded no results. See October 2013 & November 2013 Deferred Ratings (showing steps taken to obtain article); see also November 2013 Website Search (showing search of Annals of Rheumatic Diseases). The Veteran was informed of VA's attempts to obtain the requested documents, an identification of the documents that were not received and the additional action take with respect to the claims. See January 2013 and November 2013 Letters to Veteran; see also August 2014 Supplemental Statement of the Case. Additionally, the Veteran was afforded VA examinations in August 2013 and September 2013 in connection with his claim, and a VA addendum opinion was obtained in July 2014. All of the requested medical examinations and opinions with regard to the Veteran's hypothyroid, sleep disorder and right eye disorder claims have been provided. Thus, the Board finds substantial compliance with the July 2012 remand directives as they pertain to the Veteran's claims of service connection for hypothyroidism, and a sleep disorder, and his claim for an increased rating for his right eye disability. Stegall v. West, 11 Vet. App. 268 (1998).

The Veteran has not made the RO or the Board aware of any additional pertinent evidence that needs to be obtained in order to fairly decide the claims addressed in the decision below, and has not argued that any error or deficiency in the accomplishment of the duty to notify and duty to assist has prejudiced him in the adjudication of these issues. For the foregoing reasons, the Board finds that VA has satisfied its duties to notify and assist such that appellate review may proceed without prejudice to the Veteran.

II. Service Connection Claims

The Veteran seeks service connection for hypothyroidism, claiming that it is secondary to his service-connected psoriatic arthritis. Additionally, the Veteran seeks service connection for a sleep disorder, which he asserts began in service, and erectile dysfunction and bilateral lower extremity disorder as secondary to his service-connected low back disability.

Service connection may be granted for a disability or injury incurred in or aggravated by active military service. 38 U.S.C.A. § 1131(West 2014); 38 C.F.R. § 3.303 (2015). This means that the facts establish that a particular injury or disease resulting in disability was incurred coincident with service in the Armed Forces, or if preexisting such service, was aggravated therein. 38 U.S.C.A. § 1131; 38 C.F.R. § 3.303(a).

Establishing service on a direct basis connection generally requires evidence of (1) a current disability; (2) an in-service incurrence or aggravation of a disease or injury; and (3) a nexus between the claimed in-service disease or injury and the present disability. See Davidson v. Shinseki, 581 F.3d 1313 (Fed.Cir. 2009); Hickson v. West, 12 Vet. App. 247, 253 (1999); Caluza v. Brown, 7 Vet. App. 498, 506 (1995), aff'd per curiam, 78 F.3d 604 (Fed. Cir. 1996) (table). Determinations as to service connection will be based on review of all evidence of record, to include all pertinent medical and lay evidence, with due consideration to VA's policy to administer the law under a broad and liberal interpretation consistent with the facts in each individual case. 38 U.S.C.A. § 1154(a); 38 C.F.R. § 3.303(a). When there is an approximate balance of evidence for and against the issue, all reasonable doubt will be resolved in the claimant's favor. 38 U.S.C.A. § 5107; 38 C.F.R. § 3.102; Gilbert v. Derwinski, 1 Vet. App. 49 (1990). 

Where a Veteran served for at least 90 days during a period of war or after December 31, 1946, and manifests certain chronic diseases to a degree of 10 percent within one year from the date of termination of such service, such disease shall be presumed to have been incurred or aggravated in service, even though there is no evidence of such disease during the period of service. 38 U.S.C.A. §§ 1131, 1112; 38 C.F.R. §§ 3.307, 3.309. With respect to the current appeal, the list of chronic diseases includes endocrinopathies. See 38 C.F.R. § 3.309(a).

Service connection also may be established on a secondary basis for a disability that is proximately due to or aggravated by an already service-connected disorder. See 38 C.F.R. § 3.310(a). Establishing service connection on a secondary basis requires evidence sufficient to show (1) that a current disability exists and (2) that the current disability was either (a) proximately caused by or (b) proximately aggravated by a service-connected disability. See Allen v. Brown, 7 Vet. App. 439, 448 (1995) (en banc).

A. Hypothyroidism

In this case, the preponderance of the evidence is against a finding that the Veteran's hypothyroidism had its onset in or is related to an injury or disease incurred in service, or manifested to a compensable degree within one year of his separation from active military service. As an initial matter, the Board notes that the Veteran's service treatment records (STRs) do not show that he was diagnosed with or treated for hypothyroidism in service, nor is there evidence that he was suspected of having hypothyroidism in service based on any reported symptoms. See STRs, see also December 2007 and September 2013 VA Examination Reports. 

Likewise, there is no evidence in the record showing that he was diagnosed with, treated for or thought to have hypothyroidism within one year of his separation from active duty service, or that hypothyroidism manifested to a compensable degree during that time. The evidence shows that the Veteran first complained of symptoms associated with hypothyroidism in approximately 2006 or 2007. See December 2007 and September 2013 VA Examination Reports. Notably, the Veteran does not contend that his hypothyroidism had its onset in service or within one year of his separation from service. See May 2007 Written Statement. Thus, the Board finds that service connection for hypothyroidism on a direct basis is not warranted.

The Board further finds that the Veteran's hypothyroidism was not caused by, related to or aggravated by his service-connected psoriatic arthritis (PA). In reaching this conclusion, the Board credits the March 2011, January 2012, September 2013 and July 2014 opinions by the VA examiners, who referenced medical literature in rendering adverse opinions. The March 2011 VA examiner, an endocrinologist, noted that given the high frequency of hypothyroidism in the general population, the evidence describing the occurrence of thyroid disease in patients with various forms of arthritis, specifically PA, has to be viewed with caution. The examiner explained that with connective tissue diseases such as systemic lupus erythematosus (SLE) and rheumatoid arthritis (RA), which are antibody mediated diseases, the association of hypothyroidism is higher than expected, per the medical literature. The March 2011 examiner noted, however, that the Veteran has PA rather than SLE or RA, which are distinct and separate entities. The examiner stated that PA is an inflammatory arthritis associated with psoriasis, and that most patients with PA are seronegative for rheumatoid factor and lupus antibodies. The examiner further reported that an October 2006 study from Journal of Rheumatology found that while there was an increased incidence in positive thyroid antibodies and subclinical hypothyroidism in women who had PA, the same was not found to be true in men. Instead, the study found, although thyroid antibodies were increased in men with PA, the incidence of hypothyroidism was not increased. Therefore, based on the medical literature, the examiner found that it was less likely than not that the Veteran's hypothyroidism is related to or aggravated by his PA. In his January 2012 addendum opinion, the examiner clarified that his opinion was not just based on his review of the October 2006 study he referenced in his earlier opinion, but based on his review of the clinical studies available at that time. The examiner noted that the only available study discussing the association between hypothyroidism and PA was the October 2006 study. 

The September 2013 VA examiner concurred with the prior examiner's conclusions. After an examination of the Veteran and a comprehensive review of the his claims file, including all of the opinions rendered by his treating physician and the medical articles he submitted, the examiner providing the September 2013 and July 2014 medical opinions found the Veteran's hypothyroidism is not caused or aggravated by the his PA. Again, the examiner noted that the available medical literature showed that men with PA have increased prevalence of antithyroid antibodies alone, without manifestation of subclinical hypothyroidism as compared to women who manifest both positive antithyroid antibodies and subclinical hypothyroidism. The Board finds the opinions of both VA examiners highly probative as they contain clear conclusions supported by the evidence of record and a reasoned medical explanation connecting the two. See Nieves-Rodriguez, 22 Vet. App. at 304. 

The Board has also considered the opinions provided by the Veteran's treating physician concerning the relationship between his PA and thyroid disorder. In August 2007, the Veteran submitted a letter from Dr. H.D. Brannon in which he stated that the Veteran had hypothyroidism and PA, and that he "predict[ed] that the endocrine organ failure or hypothyroidism was caused by the Mixed-Collagen-Vascular Disease of [PA]." He did not provide any support or rationale for his opinion, thus, the Board affords it little probative value. See id. 

Furthermore, in February 2008, Dr. Brannon provided a second opinion letter in which he stated that the Veteran suffers from "Rheumatoid Psoriatic arthritis," and that he developed hypothyroidism "for which he has a 400 [percent] increased risk (based on the Annuals of Rheumatic Disease June 2007)." The Board affords this opinion little probative value because it is not supported by the medical evidence of record. The VA examiner providing the March 2011 and January 2012 medical opinions noted the February 2008 opinion provided by Dr. Brannon and the medical article he cited, but stated that the only article that exists with respect to the incidence of hypothyroidism among those with PA in the recent literature was the October 2006 Journal of Rheumatology article he described in his March 2011 opinion. The VA examiner further noted that there was no current literature comparing the incidence of hypothyroidism in PA to that of connective tissue disorders. 

Moreover, with regard to the argument that the Veteran has rheumatoid arthritis (RA) resulting in hypothyroidism, the Board finds that the evidence of record does not support such a finding. The Board notes that the Veteran's medical records indicate a questionable or possible diagnosis of RA and his treating physician submitted a letter stating that he had been diagnosed with RA in addition to PA. See December 2013 Written Statement of Dr. H.D. Brannon. However, the March 2011 and September 2013 VA examiners opined that there is no clinical evidence in the record supporting a diagnosis of RA. The March 2011 VA examiner stated that a review of the Veteran's medical records showed that he is rheumatoid factor negative. The VA examiner providing opinions in September 2013 and July 2014 reviewed all of the Veteran's medical records, as well as the statements from his treating physician, and found that the evidence did not support a diagnosis of RA. The examiner explained that a consultation note with the Veteran's rheumatologist in 2006 showed classic clinical manifestations and lab work-up favoring a diagnosis of PA instead of RA (i.e., the presence of psoriatic plaques on the fingers, dorsum metacarpophalangeal joints, proximal interphalangeal joints and knees with a negative rheumatoid factor), and as such the medication he had previously been prescribed for RA was discontinued and replaced with a medicine prescribed for PA. The Board finds the opinions of the VA examiners probative because they are based on a review of the Veteran's relevant medical records and objective test results. See Nieves-Rodriguez, 22 Vet. App. at 304. The Board affords the opinions of the VA examiners more probative weight than that of the treating physician because the treating physician did not provide a factual basis or rationale for his statements. See Stefl, 21 Vet. App. at 123-24.

To the extent that the Veteran himself has reported that his hypothyroidism is related to his service-connected PA, the Board notes that he is not competent to make such a determination. It is not argued or shown that the Veteran, as a lay person, is qualified through specialized education, training, or experience to determine the medical etiology of his claimed condition. See Kahana v. Shinseki, 24 Vet. App. 428, 435 (2011); see also Jandreau v. Nicholson, 492 F.3d 1372, 1376-77 (Fed. Cir. 2007) (citing Buchanan v. Nicholson, 451 F.3d 1331 (Fed. Cir. 2006)). The Board notes that the Veteran has submitted various articles that he argues support his claim; however, the September 2013 VA examination report and July 2014 VA addendum opinion demonstrate that the VA examiner reviewed and considered those articles in reaching the conclusion that there is no relationship between PA and an increased incidence of hypothyroidism in men. Thus, the Board finds that the preponderance of the evidence is against the Veteran's claim of entitlement to service connection for hypothyroidism on a secondary basis. Therefore, his claim must be denied. 38 U.S.C.A. § 5107(b); 38 C.F.R. § 3.102; Gilbert, 1 Vet. App. 49.


B. Obstructive Sleep Apnea

The Veteran also seeks service connection for a sleep disorder, diagnosed as obstructive sleep apnea (OSA). He claims that his OSA had its onset during service, as evidenced by his STRs showing complaints of sinus problems, chronic cough, eustachian tube dysfunction and weight gain. See March 2006 Written Statement. He contends that these symptoms were manifestations of his OSA during service. See id. In support of his claim, he submitted written statements from himself, his wife and his children noting that he began snoring heavily while he was in the service, and he was observed to have gained weight, be tired all the time and fall asleep while driving or in restaurants. See March 2006 Written Statements of C.R, C.R. and K.R. A November 2000 medical record notes that the Veteran reported a "chronic history" of snoring, daytime fatigue and questionable episodes of apnea, but contained no indication of when those symptoms had their onset. In connection with his claim for compensation, he reported that he experienced these symptoms in service, but he was not provided a sleep study at that time to ascertain whether he had sleep apnea. See March 2006 Written Statement.

Taking into consideration both the lay and medical evidence of record, the Board finds that it is less likely than not that the Veteran's OSA had its onset in service. The Veteran's STRs are silent as to any complaint of chronic fatigue or daytime tiredness, reports of apnea episodes, or assessment or treatment for OSA. Although the Veteran did report that he felt fatigue on one occasion, the record does not show multiple complaints of fatigue that would suggest an ongoing issue. His STRs do show multiple instances of sinus, ear, throat and eustachian tube complaints, but no indication that these symptoms were related to OSA or any other sleep disorder. Additionally, the Veteran's post-service medical records show no complaints or reports of symptoms attributed to OSA until 2000, at which point he was referred for a sleep study. He was diagnosed with sleep apnea in June 2001. See November 2000 Medical Record of Dr. J.P. Kotlarz; see also June 2001 Polysomnogram Report. 

Moreover, the September 2013 VA examiner's opinion supports a finding that it is less likely than not that the Veteran's OSA had its onset in or is related to his active duty service. After carefully reviewing the Veteran's and his family's lay statements of record reporting in-service and post-service sleep symptoms, the VA examiner opined that the Veteran's sleep apnea is less likely caused or aggravated by his military service. Based on a review of the Veteran's medical records, the examiner found that his OSA is more likely caused by a developmentally narrow oropharyngeal airway with superimposed elevation of BMI and/or natural aging, which created an encroachment on the Veteran's airway with fatty or floppy soft tissues. The Board finds the September 2013 VA examiner's opinion highly probative as it is based on a review of the relevant medical records and lay evidence of record and contains a reasoned medical explanation. See Nieves-Rodriguez, 22 Vet. App. at 304. 

There is no medical opinion evidence of record supporting the Veteran claim. Moreover, while the Veteran and his family members are competent to give testimony as to the symptoms they observed, i.e. snoring, daytime tiredness and falling asleep, they are not competent to opine that those symptoms are indicative of or were caused by OSA present in service, rather than another disorder or process. See Young v. McDonald, 766 F.3d 1348, 1352 (2014); see also Jandreau, 492 F.3d at 1376-77. Thus, the Board finds that the preponderance of the evidence is against the Veteran's claim of entitlement to service connection for OSA, and his claim must therefore be denied. 

C. Bilateral Lower Extremity Disorder and Erectile Dysfunction

The Veteran also seeks service connection for a bilateral lower extremity disorder and erectile dysfunction as secondary to his low back disorder. The Board notes that the Veteran is service connected for chronic lumbar strain only; however, he contends that his lumbar spine degenerative disc disease or degenerative joint disease is a progression of or related to his service-connected chronic lumbar strain and/or PA. See June 2015 Appellant Brief. He seeks service connection for a bilateral lower extremity disorder and erectile dysfunction as secondary to his low back disorder. See id. 

As an initial matter, the Board notes that there is no evidence showing that the Veteran's bilateral lower extremity nerve dysfunction and erectile dysfunction had their onset in service or within a year after his separation from service, or are related to a disease or injury incurred in service, and he does not contend that these conditions are related to service. As such, service connection for these disorders on a direct basis is not warranted. See 38 C.F.R. § 3.303.

The Board further finds that service connection is not warranted on a secondary basis. The most probative lay and medical evidence of record demonstrates that the Veteran's bilateral lower extremity disorder and erectile dysfunction are not caused or aggravated by his service connected chronic low back strain, but are instead related to his lumbar spine degenerative disc/joint disease. Moreover, the most probative evidence of record shows that the Veteran's lumbar spine degenerative disc/joint disease is not related to service or etiologically related to his service-connected chronic lumbar strain or PA. Thus, any disorder resulting from the Veteran's degenerative lumbar spine condition is not subject to service connection on a secondary basis.

First, with regard to the Veteran's degenerative lumbar spine disorder, the most probative evidence of record shows that this condition is separate and distinct from the Veteran's service-connected chronic lumbar muscle strain, and thus is not service connected. The Veteran was provided with VA examinations addressing his claims in June 2010, August 2013 and September 2013. The VA examiners opined that the Veteran's current degenerative disorder did not have its onset in service and was not caused by or a progression of his service-connected chronic lumbar strain. Both the June 2010 and August 2013 VA examiners reported that the Veteran was diagnosed with a back strain in service. The August 2013 VA examiner noted that the Veteran's back strain resolved in service with no residuals, as shown by his October 1988 pre-separation physical showing a diagnosis of back strain, resolved. The August 2013 VA examiner further noted that the Veteran's October 1990 lumbar spine x-ray shows a normal lumbar spine. The Veteran's lumbar spine degenerative disc/joint disease was not shown by imaging studies or diagnosed until 1993, five years after his separation from service. See August 2013 VA Examination Report.

The June 2010 VA examiner reasoned that lumbosacral muscular strain does not cause lumbar spine degenerative disc disease, and thus the two were not etiologically related. The August 2013 VA examiner agreed, stating that there is no clinical correlation or nexus between the Veteran's chronic lumbar back strain and his lumbar spine spondylosis/degenerative disc disease and subsequent surgeries in 2009 and 2012. The August 2013 examiner reasoned that while the Veteran's chronic lumbar strain involves the muscles and ligaments (soft tissues) of the spinal region, spondylosis is a degenerative process involving the discs and vertebral bodies. "The one [i.e., muscle strain] is not the cause of or related to the other [degeneration of the discs]." The August 2013 examiner went on to state that although some individuals complain of back pain with most strenuous activity from a young age, it cannot be said that such activity is the cause of multilevel (diffuse) degenerative changes that occur between the ages of 40 to 60 years. The examiner explained that according to the AMA Guides Newsletter July/August 2009 edition, the predominant predictors of degenerative disc disease are age, familial aggregation (genetics) and intrinsic disc loading (body weight compared with the size of the disc). 

Moreover, in a July 2014 addendum medical opinion, a VA examiner opined that the Veteran's service-connected PA does not affect his lumbar spine. Based on the examiner's prior physical examination of the Veteran and a review of his medical history, the July 2014 VA examiner opined that the Veteran's lumbar spine disability is due to a degenerative process involving the discs and vertebral bodies, consistent with age. See July 2014 VA Examination Report; see also September 2013 VA Examination Report. The Board finds the opinions of the June 2010, August 2013 and July 2014 VA examiners highly probative because they are based on a physical examination of the Veteran and consideration of his relevant medical history, and contain clear conclusions with supporting data and a reasoned medical explanation connecting the two. See Stefl v. Nicholson, 21 Vet. App. 120, 125 (2007); see also Nieves-Rodriguez v. Peake, 22 Vet. App. 295 (2008). 
The Board notes that the Veteran's treating physician has opined that his PA affects his spine and causes more than spondylosis; however, no rationale was provided for this opinion. See October 2010 and December 2010 Written Statement of Dr. H.D. Brannon. As such, the Board affords this opinion less probative value that those provided by the VA examiners. The Board also notes that the VA examiner providing the July 2014 addendum medical opinion originally indicated in the September 2013 VA examination report that the Veteran's PA affected his low back; however, the Board places more emphasis on the July 2014 addendum medical opinion because it speaks directly to the cause of the Veteran's low back symptoms, and is the product of a thorough review of the Veteran's medical history, as well as the opinions of his treating physician. Consequently, the Board finds that the Veteran's lumbar spine degenerative disc/joint disease is not etiologically related to or a progression of his service-connected chronic lumbar strain or PA.

The evidence of record shows that the Veteran's bilateral lower extremity condition is related to his non-service-connected lumbar spine degenerative disorder rather than his service-connected chronic low back strain. The Veteran's medical records and the written opinions provided by his treating physician show that his lower extremity symptoms of pain, incapacity, muscle atrophy, numbness, tingling and weakness are due to radiculopathy, which is related to his non-service-connected lumbar spine degenerative disc/joint disease. In his October 2010 written statement, Dr. H.D. Brannon states that the Veteran's 2009 lumbar spine surgery "resulted in his left knee continuing to be anesthetized. . . ." In his December 2010 written statement, he states that the Veteran's left lower extremity abnormality and other symptoms "are obviously from the L2-L3 nerve damage, which consequently cause the patient to fall." There is no indication in the Veteran's medical records that these symptoms are related to his service-connected chronic lumbar muscle strain. The June 2010 and August 2013 VA examiners both opined that his service-connected lumbosacral muscular strain does not cause or aggravate his bilateral lower extremity condition. Additionally, the September 2013 VA examiner noted that the Veteran had been diagnosed with residual lumbar left sensorimotor radiculopathy due to multilevel lumbar spondylosis and degenerative disc disease in 2003. As discussed above, the evidence shows that the Veteran's lumbar spine degenerative disc disease and associated symptoms are not related to his service-connected chronic lumbosacral muscle strain. 

Finally, the evidence of record shows that the Veteran's erectile dysfunction is not related to his service-connected chronic lumbar muscle strain. During the June 2010 VA examination, the Veteran reported that he has been taking testosterone supplementation for hypotestosteronemia since approximately 2008. See June 2010 VA Examination Report. The Veteran reported, however, that his erectile dysfunction did not have its onset until after his lumbar spine surgery in November 2009. Based on a physical examination and the Veteran's reported history, the June 2010 examiner found that his erectile dysfunction was caused by his hypotestosteronemia rather than his service-connected lumbar strain. The examiner reasoned that hypotestosteronemia is a common cause of erectile dysfunction, and that hypotestosteronemia is not caused by or aggravated by lumbosacral muscular strain. Thus, the June 2010 examiner opined that the Veteran's erectile dysfunction was not caused or aggravated by the Veteran's service-connected chronic lumbar strain. Although the June 2010 VA examiner noted that the Veteran's claims file was not available for review, the examiner did review the Veteran's prior VA examinations and VA medical records, and obtained a detailed medical history from the Veteran concerning his lumbar spine degenerative disc disease/joint disease, including information concerning his surgery and treatment of this condition, as well as the onset of and treatment for erectile dysfunction. Thus, the Board finds the examiner's opinion highly probative because it is based on consideration of his relevant medical history. See Stefl, 21 Vet. App. 120. 

The Veteran's lay statements are the only evidence supporting his contention that his erectile dysfunction and bilateral lower extremity symptoms are due to his chronic lumbar strain disability. Although lay persons are competent to provide opinions on some medical issues, the etiology of erectile dysfunction and bilateral lower extremity radiculopathy fall outside the realm of common knowledge of a lay person. See Kahana v. Shinseki, 24 Vet. App. 428, 435 (2011); see also Jandreau v. Nicholson, 492 F.3d 1372, 1377 n. 4 (Fed. Cir. 2007). In this case, the Board has determined that the medical evidence, to include the findings of the VA examiners, is more probative on the issues in question and outweighs the lay statements of the Veteran. Consequently, the Board finds service connection for erectile dysfunction and a bilateral lower extremity disorder is not warranted.

III. Higher Ratings

The Veteran also seeks higher ratings for his service connected chronic lumbar muscle strain and right eye corneal scar disabilities.

Disability evaluations are determined by the application of a schedule of ratings that is based on the average impairment of earning capacity. Separate diagnostic codes identify the various disabilities. 38 U.S.C.A. § 1155; 38 C.F.R., Part 4. Where there is a question as to which of two disability evaluations shall be applied, the higher evaluation is to be assigned if the disability picture more nearly approximates the criteria required for that rating. Otherwise, the lower rating is to be assigned. 38 C.F.R. § 4.7. The Veteran's entire history is reviewed when making disability evaluations. See Schafrath v. Derwinski, 1 Vet. App. 589 (1995). After careful consideration of the evidence, any reasonable doubt remaining is resolved in favor of the Veteran. 38 C.F.R. § 4.3. 

Where the evidence contains factual findings that demonstrate distinct time periods in which the service-connected disability exhibits symptoms that would warrant different evaluations during the course of the appeal, the assignment of staged ratings is appropriate. See Fenderson v. West, 12 Vet. App. 119, 126-127 (1999); Hart v. Mansfield, 21 Vet. App. 505 (2007); Francisco v. Brown, 7 Vet. App. 55, 58 (1994). Here, the Board notes that the appeal period with regard to the Veteran's chronic lumbar strain disability begins on April 5, 2010, the date VA received the claim for increased rating, plus the one-year look-back period. Gaston v. Shinseki, 605 F.3d 979, 982 (Fed. Cir. 2010). The appeal period with regard to his right eye disability begins on September 26, 2006, the date VA received the claim for an increased rating for this disability, plus the one-year look-back period. See id. The Board finds that throughout the appeal period the objective symptoms of the Veteran's chronic lumbar strain and right eye disabilities have been relatively stable and as such, staged ratings are not warranted. Hart, 21 Vet. App. 505; Gaston, 605 F.3d at 982.

A. Low Back Disability

The Veteran seeks an increased rating for his service-connected chronic low back strain, which is currently rated as 50 percent disabling. He contends that his symptoms warrant a higher rating.

The criteria for rating all disabilities of the spine are set forth in 38 C.F.R. § 4.71a, which provides that spine disabilities are to be evaluated either under the General Rating Formula for Diseases and Injuries of the Spine (General Formula) or under the Formula for Rating intervertebral disc syndrome (IVDS) Based on Incapacitating Episodes (IVDS Formula), whichever method results in the higher evaluation when all disabilities are combined under 38 C.F.R. § 4.25.

Under the General Formula for rating a disability of the spine, a 50 percent evaluation is warranted for unfavorable ankylosis of the entire thoracolumbar spine and a 100 percent evaluation is warranted for unfavorable ankylosis of the entire spine. 38 C.F.R. § 4.71a, General Formula. 

Under the IVDS Formula, a spine disability is rated based on the presence of incapacitating episodes, which are periods of acute signs and symptoms due to IVDS that require bed rest prescribed by a physician and treatment by a physician. 38 C.F.R. § 4.71a, IVDS Formula. A 60 percent rating is warranted for incapacitating episodes having a total duration of at least 6 weeks during the past 12 months.

There are several notes following the General Rating Formula criteria. As applicable here, Note (1) provides that associated objective neurological abnormalities are to be rated separately under the appropriate diagnostic code. Note (5) states that for VA compensation purposes, unfavorable ankylosis is a condition in which the entire cervical spine, the entire thoracolumbar spine, or the entire spine is fixed in flexion or extension, and the ankylosis results in one or more of the following: difficulty walking because of a limited line of vision; restricted opening of the mouth and chewing; breathing limited to diaphragmatic respiration; gastrointestinal symptoms due to pressure of the costal margin on the abdomen; dyspnea or dysphagia; atlantoaxial or cervical subluxation of dislocation; or neurologic symptoms due to nerve root stretching. Fixation of a spinal segment in neutral position (zero degrees) always represents favorable ankylosis. 38 C.F.R. § 4.71a, General Formula. 

In evaluating joint disabilities, VA must consider granting a higher rating in cases in which functional loss due to pain, weakness, excess fatigability, or incoordination is demonstrated, and those factors are not contemplated in the relevant rating criteria. See 38 C.F.R. §§ 4.40, 4.45, 4.59; DeLuca v. Brown, 8 Vet. App. 202 (1995). The Court clarified that although pain may be a cause or manifestation of functional loss, limitation of motion due to pain is not necessarily rated at the same level as functional loss where motion is impeded. See Mitchell v. Shinseki, 25 Vet. App. 32 (2011); cf. Powell v. West, 13 Vet. App. 31, 34 (1999); Hicks v. Brown, 8 Vet. App. 417, 421 (1995); Schafrath, 1 Vet. App. at 592. 

Throughout the appeal period, the Veteran's low back symptoms have included ongoing pain, decreased range of motion, stiffness, weakness, fatigability, lack of endurance, spasm, and interference with sitting, standing and weight-bearing. He reported wearing a knee brace and back brace, and ambulating with a cane or walker. He also complained of pain, numbness, weakness and instability around his left knee, and was noted to have involuntary twitching of his left lower medial quad muscle. 

The Veteran reported that his symptoms cause functional loss of decreased mobility, difficulty doing household chores, problems with prolonged sitting, driving, standing and walking, and an inability to bend, lift or climb. He reported using an electric shopping cart while grocery shopping. He further reported that his back pain interrupts his sleep, affects his ability to work and results in increased absenteeism due to pain and incapacitating episodes. With regard to flare-ups, he reported that they are usually triggered by usual household chores and overuse, and last approximately one to two days. He reported that during flare-ups he stays home, lies down, rests, takes pain medication and muscle relaxants and uses heat.

After a review of the record, the Board finds that the evidence does not support a higher rating for the Veteran's lumbar spine disability because the evidence does not demonstrate that he exhibited unfavorable ankylosis of the entire spine during the appeal period, nor does the evidence show that he experienced 6 or more weeks of incapacitating episodes of IVDS in a 12 month period. None of his VA examinations, VA medical records or private medical records notes the presence of unfavorable ankylosis of the entire spine. Although he exhibited decreased range of motion, the Veteran did not exhibit fixation of the entire spine. Although his treating physician noted in a December 2010 written statement that he had ankylosis, stiffness or fixation in his spine due to disease and surgery, the Board finds the objective physical examination findings showing no evidence of ankylosis are more probative. As such, a rating in excess of 50 percent is not warranted under these criteria. 

Moreover, the Veteran is not entitled to a higher rating based on incapacitating episodes of IVDS during the appeal period. As noted above, the Veteran is service-connected for chronic lumbar strain only, not lumbar spine degenerative disc/joint disease or IVDS. In any event, the evidence does not show that he experienced incapacitating episodes of IVDS totaling at least 6 weeks. The June 2010 VA examiner found no incapacitating episodes due to the Veteran's low back condition in the previous 12 months. The August 2013 examiner noted incapacitating episodes of IVDS resulted in no more than one week of bedrest prescribed by a physician, and the Veteran reported missing no more than 25 days of work due to back pain. The September 2013 VA examiner noted that the Veteran missed 25 days of work as a result of his back pain. Moreover, although the Veteran reported episodes of incapacitation due to his low back symptoms, there is no evidence that bed rest was prescribed by a physician for at least 6 weeks in a 12 month period at any point during the appeal period. Thus, the criteria for a rating in excess of 50 percent for the Veteran's chronic lumbar strain have not been met. 

The Board has considered whether the evidence of record supports an increased rating due to the Veteran's increased functional loss with use over a period of time or during flare-ups. Although the Veteran reported an increase in pain during flare-ups or with excessive use that cause him to take medication and rest, the Board finds that the additional functional loss described by the Veteran does not warrant an increase to the next higher rating. During the appeal period the Veteran's lumbar spine forward flexion was limited to no less than 50 degrees, and his extension was limited to no more than 10 degrees. Even considering his credible reports concerning his symptoms and functional ability during flare-ups, as well as the statements provided by his friends and family as to his functional loss, (and assuming they were produced by service connected disability), the Board finds that there is no evidence to support a finding that his functional loss would approximate unfavorable ankylosis over the entire spine or incapacitating episodes having a total duration of 6 weeks or more. As such, the Board finds that the criteria for a rating in excess of 50 percent for the Veteran's chronic lumbar strain have not been more nearly approximated. 

Additionally, the evidence of record shows that the Veteran is not entitled to a separate rating for any associated objective neurologic abnormality. As discussed above, the Veteran's erectile dysfunction and bilateral lower extremity disorder are not related to his chronic lumbar strain. There is no evidence in the Veteran's medical records or in the VA examination reports showing that he demonstrated bowel or bladder incontinence at any point during the appeal period. Moreover, there is no competent evidence showing that the Veteran exhibited any other neurological symptom related to his chronic lumbar strain. Although the Veteran may assert that some of his symptoms are related to his chronic lumbar strain disability, he is not competent to offer an opinion as to the etiology of his conditions. See Jandreau v. Nicholson, 492 F.3d 1372 (Fed. Cir. 2007). Thus, the Veteran is not entitled to any additional separate ratings for such symptoms. 

Consequently, based on the most probative evidence of record, the Board finds that the criteria for a rating higher than 50 percent have not been met for the Veteran's chronic lumbar strain disability.

B. Right Eye Corneal Scar

Additionally, the Veteran seeks a compensable rating for his right eye corneal scar disability. He is currently in receipt of a noncompensable disability rating for his right eye corneal scar under Diagnostic Code (DC) 6099-6001. The Rating Schedule does not contain a specific diagnostic code for a corneal scar; however, where an unlisted condition is encountered, it is permissible to rate it under a closely related disease or injury, in which not only the functions affected, but the anatomical localization and symptomatology are closely analogous. 38 C.F.R. § 4.20. In this case, the RO determined that the most closely analogous diagnostic code was 38 C.F.R. § 4.84a, DC 6001, which pertains to keratitis, an inflammation of the cornea. See DORLAND'S ILLUSTRATED MEDICAL DICTIONARY 979 (32nd ed. 2012). 

During the pendency of the appeal, the criteria for rating eye disabilities changed, with the new regulation becoming effective December 10, 2008. VA's General Counsel has held that where a law or regulation changes during the pendency of an appeal, the Board should first determine which version of the law or regulation is more favorable to the Veteran. If the application of the revised regulation results in a higher rating, the effective date for the higher disability rating can be no earlier than the effective date of the change in the regulation. 38 U.S.C.A. § 5110(g). Prior to the effective date of the change in the regulation, the Board can apply only the original version of the regulation. See VAOPGCPREC 3-2000 (April 10, 2000).

Under the former version of DC 6001, keratitis, in chronic form, is to be rated from 10 percent to 100 percent for impairment of visual acuity or field loss, pain, rest-requirements, or episodic incapacity. An additional 10 percent is combined during the continuance of active pathology and 10 percent is the minimum evaluation during active pathology. See 38 C.F.R. § 4.84a, DC 6001 (2008). The current version of DC 6001 directs that keratopathy is to be rated on the basis of either visual impairment due to the particular condition or on incapacitating episodes according to a General Rating Formula, whichever results in a higher rating. 38 C.F.R. § 4.79, DC 6001. 

Under both the former and current versions of the applicable rating criteria, impairment of visual acuity shall generally be evaluated on the basis of corrected distance vision. See 38 C.F.R. § 4.84a (2008); see also 38 C.F.R. § 4.76 (2015). Under the new criteria, where impairment of only one eye is service-connected, the visual acuity of the non-service-connected eye shall be considered 20/40 for evaluation purposes. See 38 C.F.R. § 4.75(c).

Both under the old and new criteria, a noncompensable rating is assigned if corrected visual acuity is 20/40 or better in both eyes. See 38 C.F.R. § 4.84a, DC 6075-607979 (2008); see also 38 C.F.R. § 4.79, DC 6066 (2015). A 10 percent rating is assigned for vision of either 20/50, 20/70 or 20/100 in one eye and 20/40 in the other, or 20/50 in both eyes. See id. A 20 percent evaluation is assigned for vision of 20/70 or 20/100 in one eye and 20/50 in the other, or vision of 20/200 or 15/200 in one eye and 20/40 in the other. See id. Higher disability ratings are available for additional loss of visual acuity. See id. 

The Board finds that the Veteran's right eye disability more nearly approximates the criteria for a 10 percent rating under the former DC 6001 criteria, which were in effect at the time his claim for an increased rating was received. The January 2007 VA examiner noted that the Veteran's right eye corneal scar caused photophobia, glare at night and occasional stabbing pains. See January 2007 VA Examination Report. Based on this evidence, the Board finds that the Veteran's symptoms warrant a 10 percent rating, but no higher, under the former DC 6001. A higher rating is not warranted under the former or current rating criteria for DC 6001 because the evidence of record shows that the Veteran has not had an impairment of central visual acuity in his service-connected right eye to less than 20/40 corrected, has not had any impairment in his visual field or muscle function, and has not experienced any incapacitating episodes due to his right eye corneal scar during the appeal period. See January 2007 & September 2013 VA Examination Reports. 

The Board has considered whether an increased or separate rating would be warranted under another Diagnostic Code applicable to the eyes, but finds that such rating is not available. Separate disability ratings may be assigned for distinct disabilities resulting from the same injury so long as the symptomatology for one condition was not "duplicative of or overlapping with the symptomatology" of the other condition. See Esteban v. Brown, 6 Vet. App. 259, 262 (1994). Review of the evidence of record does not demonstrate the Veteran has any symptoms warranting a higher or separate rating under any other Diagnostic Codes pertaining to the eye. The Veteran's right corneal scar with resultant intermittent eye pain, glare and photophobia is not shown to involve any other factor that would warrant a higher evaluation of the disability under any other provisions of the prior or current version of the rating schedule. The Board has specifically considered DC 6011 pertaining to retinal scars and DC 6036 for the residuals of a corneal transplant; however, a maximum 10 percent rating is available under these Diagnostic Codes. See 38 C.F.R. §§ 4.79, 4.84a DCs 6011, 6036.

C. Extraschedular Consideration

The evidence shows that the Veteran's chronic lumbar strain and right eye disabilities do not warrant referral for an extraschedular rating under 38 C.F.R. § 3.321(b)(1)(2015). The threshold element for an extraschedular rating, "an exceptional disability picture," is met where the diagnostic criteria do not reasonably describe or contemplate the severity and symptomatology of a veteran's service-connected disabilities. Thun v. Peake, 22 Vet. App. 111, 115 (2008). Here, the schedular rating criteria reasonably contemplate the Veteran's lumbar strain symptoms, which if assumed are related to that disability would include pain, decreased range of motion, stiffness, weakness, fatigability, lack of endurance, spasm, and interference with sitting, standing and weight-bearing, which cause him to use a knee brace, back brace, cane or walker. The rating criteria also contemplate the Veteran's right eye symptoms including (scarring, pain, blurring/glare and photophobia). The rating criteria also provide for additional or more severe symptoms than currently shown by the evidence. As the rating schedule contemplates pain and functional loss such as weakened movement, instability of station, disturbance of locomotion and interference with sitting, standing and weight bearing, it would reasonably contemplate the other symptoms and functional loss he has described. 38 C.F.R. §§ 4.40, 4.45. The Board finds that the functional limitations described by the Veteran (i.e., decreased mobility, difficulty doing household chores, problems with prolonged sitting, driving, standing and walking, and an inability to bend, lift or climb, difficulty shopping and increased absenteeism due to pain and incapacitating episodes) are contemplated by the rating schedule. Therefore, the Board finds that the Veteran does not present an exceptional or unusual disability picture such that referral for consideration of an extraschedular rating is warranted.

Moreover, the Board notes that under Johnson v. McDonald, 762 F.3d 1362 (Fed. Cir. 2014) a veteran may be awarded an extraschedular rating based upon the combined effect of multiple conditions in an exceptional circumstance where the evaluation of the individual conditions fails to capture all of the service-connected disabilities experienced. However, in this case, there are no additional symptoms related to his service-connected disabilities that have not been attributed to a specific service-connected disability and addressed by the rating criteria. Although the Veteran's treating physician has indicated that the combined effects of the symptoms related to his PA, lumbar spine, left lower extremity nerve condition and sleep apnea resulted in a decreased quality of life, the Board notes that the referenced lumbar spine disorder, bilateral lower extremity disorder and sleep apnea are not service connected. Thus, the symptoms relating to these conditions cannot be considered in assigning an extraschedular rating. Accordingly, this is not an exceptional circumstance in which extraschedular consideration may be required to adequately compensate the Veteran for a disability that can be attributed only to the combined effect of multiple service-connected conditions.

Thus, the Board finds that the Veteran has not described other functional effects that are "exceptional" or not otherwise contemplated by the assigned evaluations. Rather, his symptoms are consistent with the degrees of disability addressed by such evaluations. The rating criteria are therefore adequate to evaluate the Veteran's disabilities and referral for consideration of an extraschedular rating is not warranted. 

D. Unemployability

Finally, the Board finds that the issue of entitlement to a total disability rating based on individual unemployability (TDIU) has not been reasonably raised by the record because the September 2013 VA examiner noted that the Veteran is currently employed on a full time basis, and the Veteran has not made any assertions of unemployability. See Rice v. Shinseki, 22 Vet. App. 447 (2009). 


ORDER

Entitlement to service connection for hypothyroidism is denied. 

Entitlement to service connection for a sleep disorder is denied.

Entitlement to service connection for a bilateral lower extremity disorder is denied.

Entitlement to service connection for erectile dysfunction is denied.

Entitlement to an increased rating for a chronic low back strain is denied.

Subject to the law and regulations governing payment of monetary benefits, entitlement to a 10 percent rating for a right eye disability throughout the appeal period is granted.


REMAND

The Board remands the issue entitlement to an increased rating for psoriatic arthritis (PA) to provide the Veteran with a new VA examination addressing the severity of his PA. The evaluation of PA may turn on the number of incapacitating exacerbations it produces during a year. The examination report from September 2013 is unclear as to whether the incapacitating episodes described are a result of PA or whether symptoms from non-service connected impairment were a contributing factor. This should be clarified on remand. 

Accordingly, the case is REMANDED for the following action:

1. Ask the Veteran what additional records, if any, he would like to have considered in connection with the remanded issues. Any identified documents for which an authorization is provided should be obtained.

2. Thereafter, schedule the Veteran for a VA examination to address nature and severity of the Veteran's service-connected psoriatic arthritis (PA) and associated symptomatology. Specifically, the examiner should describe whether the Veteran has had any incapacitating exacerbations of PA at any point during the appeal period. In accomplishing this, the examiner is requested to distinguish between symptoms associated with PA, from those associated with other non-service connected disabilities. If it is not possible to make that distinction, the examiner should note that fact. 

The claims file should be made available to and reviewed by the examiner and all necessary tests should be performed. All findings should be reported in detail, including specifically whether the Veteran has experienced any incapacitating exacerbations at any point during the appeal period (September 2005 to the present). The examiner should also address whether the Veteran has any current constitutional manifestations associated with active joint involvement that are totally incapacitating. 

The examination report should include a complete rationale for all opinions expressed. If the examiner feels that a requested opinion cannot be rendered without resorting to speculation, the examiner should state why this is so.

3. After the above development has been completed, including any additional development deemed necessary, readjudicate the remanded issue. If any benefit sought on appeal remains denied, furnish the Veteran and his representative with a supplemental statement of the case and afford them the opportunity to respond before the file is returned to the Board for further consideration.

The appellant has the right to submit additional evidence and argument on the matter the Board has remanded. Kutscherousky v. West, 12 Vet. App. 369 (1999).

This claim must be afforded expeditious treatment. The law requires that all claims that are remanded by the Board of Veterans' Appeals or by the United States Court of Appeals for Veterans Claims for additional development or other appropriate action must be handled in an expeditious manner. See 38 U.S.C.A. §§ 5109B, 7112 (West 2014).




______________________________________________
MICHAEL E. KILCOYNE
Veterans Law Judge, Board of Veterans' Appeals






Department of Veterans Affairs